# JEFFERSON COUNTY PHARMACEUTICAL ASSOCIA-
# TION, INC. *v.* ABBOTT LABORATORIES ET AL.

No. 81–827.   Argued November 8, 1982—Decided February 23, 1983

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEVENS, J., filed a dissenting opinion, *post,* p. 171. O'CONNOR, J., filed a dissenting opinion, in which BRENNAN, REHNQUIST, and STEVENS, JJ., joined, *post,* p. 174.

*Joe L. Tucker, Jr.,* argued the cause and filed briefs for petitioner.

*David Klingsberg* argued the cause for respondents. With him on the brief for respondents Abbott Laboratories et al. was *Michael Malina. John J. Coleman, Jr., E. Mabry Rogers,* and *Ina B. Leonard* filed a brief for respondent Board of Trustees of the University of Alabama.*

JUSTICE POWELL delivered the opinion of the Court.

The issue presented is whether the sale of pharmaceutical products to state and local government hospitals for resale in competition with private retail pharmacies is exempt from the proscriptions of the Robinson-Patman Act.

I

Petitioner, a trade association of retail pharmacists and pharmacies doing business in Jefferson County, Alabama,

---

*Briefs of *amici curiae* urging reversal were filed by *Paul L. O'Brien* and *Frank M. Northam* for the American Pharmaceutical Association; and by *John S. Hoff* and *Fred W. Geldon* for the National Association of Retail Druggists.

*George H. Cross* filed a brief for the National Association of Counties as *amicus curiae.*

commenced this action in 1978 in the District Court for the Northern District of Alabama as the assignee of its members' claims. Respondents are 15 pharmaceutical manufacturers, the Board of Trustees of the University of Alabama, and the Cooper Green Hospital Pharmacy. The University operates a medical center, including hospitals, and a medical school. Located in the University's medical center are two pharmacies. Cooper Green Hospital is a county hospital, existing as a public corporation under Alabama law.

The complaint seeks treble damages and injunctive relief under §§ 4 and 16 of the Clayton Act, 38 Stat. 731, 737, 15 U. S. C. §§ 15 and 26, for alleged violations of §§ 2(a) and (f) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act (Act), 49 Stat. 1526, 15 U. S. C. §§ 13(a) and (f). Petitioner contends that the respondent manufacturers violated § 2(a)[1] by selling their products to the University's two pharmacies and to Cooper Green Hospital Pharmacy at prices lower than those charged petitioner's members for like products. Petitioner alleges that the respondent hospital pharmacies knowingly induced such lower prices in violation of § 2(f)[2] and sold the drugs to the general public in direct competition with privately owned pharmacies. Petitioner

---

[1] Section 2(a), 15 U. S. C. § 13(a), provides in relevant part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . , and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

[2] Section 2(f), 15 U. S. C. § 13(f), provides:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."

also alleges that the price discrimination is not exempted from the proscriptions of the Act by 15 U. S. C. § 13c.[3]

Respondents moved to dismiss the complaint on the ground that state purchases[4] are exempt as a matter of law from the sanctions of § 2. In granting respondents' motions, the District Court expressly accepted as true the allegations that local retail pharmacies had been injured by the challenged price discrimination and that at least some of the state purchases were not exempt under § 13c. 656 F. 2d 92, 98 (CA5 1981) (reprinting District Court's opinion as Appendix). The District Court held that "governmental purchases are, without regard to 15 U. S. C. § 13c, beyond the intended reach of the Robinson-Patman Price Discrimination Act, at least with respect to purchases for hospitals and other traditional governmental purposes." *Id.*, at 102. The Court of Appeals for the Fifth Circuit, in a divided *per curiam* decision, affirmed "on the basis of the district court's Memorandum of Opinion." *Id.*, at 93.[5]

We granted certiorari to resolve this important question of federal law. 455 U. S. 999 (1982). We now reverse.

## II

The issue here is narrow. We are not concerned with sales to the Federal Government, nor with state purchases

---

[3] Section 13c provides:

"Nothing in [the Robinson-Patman Act] shall apply to purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, hospitals, and charitable institutions not operated for profit."

[4] "State purchases" are defined as sales to and purchases by a State and its agencies.

[5] The District Court, and thus the Court of Appeals, agreed that "[t]he claims against the Board must . . . be treated as equivalent to claims against the State itself." 656 F. 2d, at 99. Accordingly, both courts held that the Eleventh Amendment bars petitioner's claim for damages against the University. Petitioner did not challenge this holding in its appeal from the District Court's decision.

for *use* in traditional governmental functions.[6] Rather, the issue before us is limited to state purchases for the purpose of competing against private enterprise—with the advantage of discriminatory prices—in the retail market.[7]

The courts below held, and respondents contend, that the Act exempts all state purchases. Assuming, without deciding, that Congress did not intend the Act to apply to state purchases for consumption in traditional governmental functions, and that such purchases are therefore exempt, we conclude that the exemption does not apply where a State has chosen to compete in the private retail market.

### III

The Robinson-Patman Act by its terms does not exempt state purchases. The only express exemption is that for

---

[6] Respondents argue that application of the Act to purchases by the State of Alabama would present a significant risk of conflict with the Tenth Amendment and that we therefore should avoid any construction of the Act that includes such purchases. See *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 501 (1979). There is no risk, however, of a constitutional issue arising from the application of the Act in this case: The retail sale of pharmaceutical drugs is not "indisputably" an attribute of state sovereignty. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 288 (1981). It is too late in the day to suggest that Congress cannot regulate States under its Commerce Clause powers when they are engaged in proprietary activities. See, *e. g.*, *Parden* v. *Terminal Railway of Alabama State Docks Dept.*, 377 U. S. 184, 187–193 (1964). If the Tenth Amendment protects certain state purchases from the Act's limitations, such as for consumption in traditional governmental functions, those purchases must be protected on a case-by-case basis. Cf. *City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 413, and n. 42 (1978) (plurality opinion).

[7] Special solicitude for the plight of indigents is a traditional concern of state and local governments. If, in special circumstances, sales were made by a State to a class of indigents, the question presented, that we need not decide, would be whether such sales are "in competition" with private enterprise. The District Court correctly assumed that the private and state pharmacies in this case are "competing pharmacies." 656 F. 2d, at 98. See also n. 8, *infra*.

nonprofit institutions contained in 15 U. S. C. § 13c.[8]  More-
over, as the courts below conceded, "[t]he statutory lan-
guage—'persons' and 'purchasers'—is sufficiently broad to
cover governmental bodies.   15 U. S. C. §§ 12, 13(a, f)."
656 F. 2d, at 99.[9]   This concession was compelled by several
of this Court's decisions.[10]   In *City of Lafayette* v. *Louisiana
Power & Light Co.*, 435 U. S. 389, 395 (1978), for example,
we stated without qualification that "the definition of 'person'
or 'persons' embraces both cities and States."[11]

---

[8] The District Court properly assumed, for purposes of making its sum-
mary judgment, that at least some of the hospital purchases would not be
covered by the § 13c exemption.   See n. 3, *supra*, and accompanying text.
Therefore, we need not consider whether this express exemption would
support summary judgment in cases against state hospitals purchasing for
their own use.   See n. 20, *infra*.

[9] The words "person" and "persons" are used repeatedly in the antitrust
statutes.   See 15 U. S. C. §§ 7, 12, 15.

[10] See, *e. g.*, *Georgia* v. *Evans*, 316 U. S. 159, 162 (1942) (State is a "per-
son" under § 7 of the Sherman Act); *Chattanooga Foundry & Pipe Works*
v. *City of Atlanta*, 203 U. S. 390, 396 (1906) (municipality is a "person"
within the meaning of § 8 of the Sherman Act).   See also *Pfizer Inc.* v.
*Government of India*, 434 U. S. 308, 318 (1978) (foreign nation is a "per-
son" under § 4 of the Clayton Act).

The Court has not considered it at all "anomalous to require compliance
by municipalities with the substantive standards of other federal laws
which impose . . . sanctions upon 'persons.'"   *City of Lafayette* v. *Louisi-
ana Power & Light Co.*, *supra*, at 400.   See *California* v. *United States*,
320 U. S. 577, 585–586 (1944); *Ohio* v. *Helvering*, 292 U. S. 360, 370 (1934).
One case is of particular relevance.   In *Union Pacific R. Co.* v. *United
States*, 313 U. S. 450 (1941), the Court considered the applicability to a city
of § 1 of the Elkins Act, 32 Stat. 847, as amended, 34 Stat. 587, 49 U. S. C.
§ 41(1) (repealed 1978), "a statute which essentially is an antitrust provi-
sion serving the same purposes as the anti-price-discrimination provisions
of the Robinson-Patman Act."   *City of Lafayette*, *supra*, at 402, n. 19.
The *Union Pacific* Court expressly found that a municipality was a "per-
son" within the meaning of the statute.   313 U. S., at 462–463.   See also
*City of Lafayette*, *supra*, at 401, n. 19.

[11] The word "purchasers" has a meaning as inclusive as the word "per-
son."   See 80 Cong. Rec. 6430 (1936) (remarks of Sen. Robinson) ("The
Clayton Antitrust Act contains terms general to all purchasers.   The

Respondents would distinguish *City of Lafayette* from the case before us because it involved the Sherman Act rather than the Robinson-Patman Act.[12] Such a distinction ignores the specific reference to the Robinson-Patman Act in our discussion of the all-inclusive nature of the term "person." *Id.*, at 397, n. 14. We do not perceive any reason to construe the word "person" in that Act any differently than we have in the Clayton Act, which it amends,[13] and it is undisputed that the Clayton Act applies to States. See *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 260–261 (1972).[14] In sum, the plain lan-

---

pending bill does not segregate any particular class of purchasers, or exempt any special class of purchasers").

[12] The only apparent difference between the scope of the relevant laws is the extent to which the activities complained of must affect interstate commerce. Congress' decision in the Robinson-Patman Act not to cover all transactions within its reach under the Commerce Clause, see *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186, 199–201 (1974), does not mean that Congress chose not to cover the same range of "persons" whose conduct "in commerce" is otherwise subject to the Act.

[13] Indeed, the House and Senate Committee Reports specifically state that "[t]he special definitions of section 1 of the Clayton Act will apply without repetition to the terms concerned where they appear in this bill, since it is designed to become by amendment a part of that act." H. R. Rep. No. 2287, 74th Cong., 2d Sess., pt. 1, p. 7 (1936); S. Rep. No. 1502, 74th Cong., 2d Sess., 3 (1936). See 80 Cong. Rec. 3116 (1936) (remarks of Sen. Logan) ("[M]any have complained because the provisions of the bill apply to 'any person engaged in commerce.' . . . The original Clayton Act contains that exact language, and it is carried into the bill under consideration. The language of the Clayton Act was used because it has been construed by the courts"). Given their common purposes, it should not be surprising that the common terms of the Clayton and Robinson-Patman Acts should be construed consistently with each other. See *id.*, at 8137 (remarks of Rep. Michener) ("The Patman-Robinson bill does not suggest a new policy or a new theory. The Clayton Act was enacted in 1914, and it was the purpose of that act to do just what this law sets out to do"); *id.*, at 3119 (remarks of Sen. Logan) (purpose of Robinson-Patman bill is to strengthen Clayton Act); *id.*, at 6151 (address by Sen. Logan) (same).

[14] JUSTICE O'CONNOR, in her dissenting opinion, questions our use of antitrust cases to define a word common to the antitrust laws. She would distinguish all of these cases uniformly holding States to be included in the

guage of the Act strongly suggests that there is no exemption for state purchases to compete with private enterprise.

## IV

The plain language of the Act is controlling unless a different legislative intent is apparent from the purpose and history of the Act. An examination of the legislative purpose and history here reveals no such contrary intention.

## A

Our cases have been explicit in stating the purposes of the antitrust laws, including the Robinson-Patman Act. On numerous occasions, this Court has affirmed the comprehensive coverage of the antitrust laws and has recognized that these laws represent "a carefully studied attempt to bring within [them] every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states." *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 553 (1944).[15] In *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), the Court observed that "our cases have repeatedly established that there is a heavy pre-

---

word "persons," because none has held "that States or local governments are persons for purposes of exposure to *liability* as purchasers under the provisions of the Clayton Act." *Post*, at 177 (emphasis in original). The dissent takes no notice, however, of our decision last Term in *Community Communications Co.* v. *City of Boulder*, 455 U. S. 40, 56 (1982), in which the Court stated that the antitrust laws, "like other federal laws imposing civil or criminal sanctions upon 'persons,' of course apply to municipalities as well as to other corporate entities." No authority is cited for the dissent's distinction between "persons" entitled to sue under the antitrust laws and "persons" subject to suit under those laws.

[15] See, *e. g., Pfizer Inc.* v. *Government of India, supra*, at 312–313 (noting "broad scope of the remedies provided by the antitrust laws") (applying Sherman Act cases to construe Clayton Act); *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S. 219, 236 (1948) ("[Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by *whomever* they may be perpetrated") (emphasis added).

sumption against implicit exemptions" from the antitrust laws. *Id.*, at 787 (citing *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 350–351 (1963); *California* v. *FPC*, 369 U. S. 482, 485 (1962)).[16] In *City of Lafayette, supra,* applying antitrust laws to a city in competition with a private utility, we held that no exemption for local governments would be implied. The Court emphasized the purposes and scope of the antitrust laws: "[T]he economic choices made by public corporations . . . , designed as they are to assure maximum benefits for the community constituency, are not inherently more likely to comport with the broader interests of national economic well-being than are those of private corporations acting in furtherance of the interests of the organization and its shareholders." 435 U. S., at 403. See also *id.*, at 408.[17]

These principles, and the purposes they further, have been helpful in interpreting the language of the Robinson-Patman

---

[16] See, *e. g., National Gerimedical Hospital & Gerontology Center* v. *Blue Cross of Kansas City,* 452 U. S. 378, 388 (1981); *City of Lafayette,* 435 U. S., at 398, 399; *Abbott Laboratories* v. *Portland Retail Druggists Assn., Inc.,* 425 U. S. 1, 11–12 (1976); *United States* v. *National Assn. of Securities Dealers, Inc.,* 422 U. S. 694, 719–720 (1975).

[17] In one important sense, retail competition from state agencies can be more invidious than that from chainstores, the particular targets of the Robinson-Patman Act. Volume purchasing permits any large, relatively efficient, retail organization to pass on cost savings to consumers, and, to that extent, consumers benefit merely from economy of scale. But to the extent that lower prices are attributable to lower overhead, resulting from federal grants, state subsidies, free public services, and freedom from taxation, state agencies merely redistribute the burden of costs from the actual consumers to the citizens at large. An exemption from the Robinson-Patman Act could give state agencies a significant *additional* advantage in certain commercial markets, perhaps enough to eliminate marginal or small private competitors. Consumers, as citizens, ultimately will pay for the full costs of the drugs sold by the state agencies involved in this case. Because there is no reason to assume that such agencies will provide retail distribution more efficiently than private retail pharmacists, consumers will suffer to the extent that state retail activities eliminate more efficient, private retail distribution systems.

Act.  As JUSTICE BLACKMUN stated for the Court in *Abbott Laboratories* v. *Portland Retail Druggists Assn., Inc.*, 425 U. S. 1, 11–12 (1976):

> "It has been said, of course, that the antitrust laws, and Robinson-Patman in particular, are to be construed liberally, and that the exceptions from their application are to be construed strictly.  *United States* v. *McKesson & Robbins*, 351 U. S. 305, 316 (1956); *FMC* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 733 (1973); *Perkins* v. *Standard Oil Co.*, 395 U. S. 642, 646–647 (1969).  The Court has recognized, also, that Robinson-Patman 'was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power.'  *FTC* v. *Broch & Co.*, 363 U. S. 166, 168 (1960); *FTC* v. *Fred Meyer, Inc.*, 390 U. S. 341, 349 (1968).  Because the Act is remedial, it is to be construed broadly to effectuate its purposes.  See *Tcherepnin* v. *Knight*, 389 U. S. 332, 336 (1967); *Peyton* v. *Rowe*, 391 U. S. 54, 65 (1968)."

### B

The legislative history falls far short of supporting respondents' contention that there is an exemption for state purchases of "commodities" for "resale."  There is nothing whatever in the Senate or House Committee Reports, or in the floor debates, focusing on the issue.[18]  Some Members of Congress were aware of the possibility that the Act would

---

[18] JUSTICE O'CONNOR's dissenting opinion repeatedly emphasizes that Congress in 1936 did not focus specifically on the issue presented here. See *post*, at 180, 182, 187, and n. 10.  This may well be true, as the likelihood of state entities competing in the private sector was remote in 1936. It cannot be contended, however, that Congress specifically intended to *allow* the competition at issue here.  In any event, the absence of congressional focus is immaterial where the plain language applies.  See, e. g., *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 556–558 (1944); *Browder* v. *United States*, 312 U. S. 335, 339 (1941); *De Lima* v. *Bidwell*, 182 U. S. 1, 197 (1901).

apply to governmental purchases. Most Members, however, were concerned not with state purchases, but with possible limitations on the Federal Government. The most relevant legislative history is the testimony of the Act's principal draftsman, H. B. Teegarden, before the House Judiciary Committee.[19] Although the testimony is ambiguous on the

---

[19] "[Rep.] LLOYD: Would this bill, in your judgment, prevent the granting of discounts to the United States Government?

"Mr. TEEGARDEN: Not unless the present Clayton Act does so. . . .

"[Rep.] LLOYD: For instance, the Government gets huge discounts. . . . Now, would that discount be barred by this bill?

"Mr. TEEGARDEN: I do not see why it should, unless a discount contrary to the present bill would be barred—that is, the present law—would be barred by that bill.

"Aside from that, my answer would be this: *The Federal Government is not in competition* with other buyers from these concerns. . . .

.        .        .        .        .

"The Federal Government is saved by the same distinction . . . . They are not in competition with anyone else who would buy.

"[Rep.] HANCOCK: It would eliminate competitive bidding all along the line, would it not, in classes of goods that would be covered by this bill?

"Mr. TEEGARDEN: You mean competitive bidding on Government orders?

"[Rep.] HANCOCK: Government, State, city, municipality.

"Mr. TEEGARDEN: No; I think not.

"[Rep.] MICHENER: If it did do it, you would not want it, would you?

"Mr. TEEGARDEN: No; I would not want it. It certainly does not eliminate competitive bidding anywhere else, and I do not see how it would with the Government.

"[Rep.] HANCOCK: You would have to bid to the city, county, exactly the same as anybody else; same quantity, same price, same quality?

"Mr. TEEGARDEN: No.

"[Rep.] HANCOCK: *Would they or could they sell to a city hospital any cheaper than they would to a privately-owned hospital, under this bill?*

"Mr. TEEGARDEN: I would have to answer it in this way. In the final analysis, it would depend upon numerous questions of fact in a particular case. *If the two hospitals are in competition with each other, I should say then that the fact that one is operated by the city does not save it from the bill.* If they are not in competition with each other, then they are in a different sphere.

application of the Act to state purchases for consumption, one conclusion is certain: Teegarden expressly stated that the Act would apply to the purchases of municipal hospitals in at least some circumstances.[20] Thus, his comments directly contradict the exemption found by the courts below for all such purchasing.[21] In the absence of any other relevant evi-

"The facts of the situation are not present upon which to predicate a discrimination, in the nature of the case. I do not see that that question becomes any different under this bill from what it is under the present section 2 of the Clayton Act, for that bill also prohibits discrimination generally in the same terms that this does. But it differs in the breadth of the exceptions. That is the only difference between the two bills." Hearings on H. R. 8442 et al. before the House Committee on the Judiciary, 74th Cong., 1st Sess., 208–209 (1935) (emphasis added) (hereinafter 1935 Hearings).

[20] JUSTICE STEVENS agrees that state and local governments may be "purchasers" within the meaning of the Robinson-Patman Act. See post, at 171. He joins in JUSTICE O'CONNOR's dissent, however, on the basis of a novel theory: that state and local agencies may never be in "competition" with private parties within the meaning of the Act. See ibid. This is an economic fiction: If in fact a State participates in the private retail pharmaceutical market, it competes with the private participants. JUSTICE STEVENS relies on one statement by witness Teegarden in the 1935 House Hearings, but attaches no significance to a further statement by the same witness: "In the final analysis, it would depend upon numerous questions of fact in a particular case. If the two hospitals are in competition with each other, I should say then that the fact that one is operated by the city does not save it from the bill." See 1935 Hearings, at 209 (emphasis added).

[21] Teegarden subsequently submitted a written brief to the House Committee. He first rejected outright the desirability of any exemptions. See id., at 249. He then posed the question whether "the bill [would] prevent competitive bidding on Governmental purchases below trade price levels." He stated that "[t]he answer is found in the principle of statutory construction that a statute will not be construed to limit or restrict in any way the rights, prerogatives, or privileges of the sovereign unless it so expressly provides—a principle inherited by American jurisprudence from the common law . . . ." But he also noted that "requiring a showing of effect upon competition . . . will further preclude any possibility of the bill affecting the Government." Id., at 250.

All the cases Teegarden cited suggest that this sovereign-exception rule of statutory construction simply means that a government, when it passes

dence, we find no legislative intention to enable a State, by an unexpressed exemption, to enter private competitive markets with congressionally approved price advantages.[22]

a law, gives up only what it expressly surrenders. While the Robinson-Patman Act was pending before Congress, the Court stated that it could "perceive no reason for extending [the presumption against binding the sovereign by its own statute] so as to exempt a business carried on by a state from the otherwise applicable provisions of an act of Congress, all-embracing in scope and national in its purpose, which is as capable of being obstructed by state as by individual action." *United States* v. *California*, 297 U. S. 175, 186 (1936). See *California* v. *Taylor*, 353 U. S. 553, 562–563 (1957). In the context of the Robinson-Patman Act, the rule of statutory construction on which Teegarden relied supports, at the most, an exemption for the *Federal* Government's purchases. The existence of such an exemption is not before us. Cf. *United States* v. *Cooper Corp.*, 312 U. S. 600, 604–605 (1941) (United States not a "person" under the Sherman Act for purposes of suing for treble damages). Moreover, Teegarden clearly assumed that governmental purchasing would not compete with private purchasing. That assumption, however, is inapplicable here.

[22] Six months after the Act was passed, the Attorney General of the United States responded to an inquiry from the Secretary of War regarding the Act's application "to government contracts for supplies." 38 Op. Atty. Gen. 539 (1936). In ruling that such contracts are outside the Act, the Attorney General explained:

"[S]tatutes regulating rates, charges, etc., in matters affecting commerce do not ordinarily apply to the Government unless it is expressly so provided; and it does not seem to have been the policy of the Congress to make such statutes applicable to the Government. . . .

"The [Robinson-Patman Act] merely amended the [Clayton Act] and, in so far as I am aware, the latter Act has not been regarded heretofore as applicable to Government contracts." *Id.*, at 540.

Later in the letter, the Attorney General clarified that his reference was to "the Federal Government," *ibid.*, and gave other reasons "for avoiding a construction that would make the statute applicable to the Government in violation of the apparent policy of the Congress in such matters," *id.*, at 541. The Attorney General expressly relied upon *Emergency Fleet Corp.* v. *Western Union Telegraph Co.*, 275 U. S. 415, 425 (1928), in which the Court upheld the granting of favorable telegraph rates to a *federal* corporation that competed with private enterprise.

# V

Despite the plain language of the Act and its legislative history, respondents nevertheless argue that subsequent legislative events and decisions of District Courts confirm that state purchases are outside the scope of the Act. We turn therefore to these subsequent events.

The Attorney General's opinion says nothing about the Act's applicability to state agencies. Indeed, in the following year, the Attorney General of California expressly concluded that state purchases were within the Act's proscriptions. See 1932–1939 Trade Cases ¶ 55,156, pp. 415–416 (1937). Two other early State Attorney General opinions simply do not consider whether the Act applies to state purchases for *retail* sales. See Opinion of Attorney General of Minnesota, 1932–1939 Trade Cases ¶ 55,157, p. 416 (1937); 26 Wis. Op. Atty. Gen. 142 (1937).

Representative Patman "presumed that the [United States] Attorney General's reasons may be also applied to municipal and public institutions." W. Patman, The Robinson-Patman Act 168 (1938). See also W. Patman, Complete Guide to the Robinson-Patman Act 30 (1963) (interpreting Attorney General's opinion as exempting all governmental purchases). His interpretation is entitled to some weight, but he appears only to be interpreting—or erroneously extending—the Attorney General's opinion and reasoning. Representative Patman's personal intentions probably are better reflected in his introduction in 1951 and 1953 of bills to amend the Act to define "purchaser" to include "the United States, any State or any political subdivision thereof." H. R. 4452, 82d Cong., 1st Sess. (1951); H. R. 3377, 83d Cong., 1st Sess. (1953). There is no legislative history on these bills, but it is arguable that he believed that the original intent needed to be stated expressly to negate his reading of the Attorney General's contrary construction of the Act. In any case, Congress' failure to pass these bills may be attributable to a reluctance to subject *federal* purchases to the Act. For example, in 1955, 1957, 1959, and 1961, Representative Keogh also unsuccessfully introduced bills to extend the Act to federal purchases only *for resale*. See H. R. 430, 87th Cong., 1st Sess. (1961); H. R. 155, 86th Cong., 1st Sess. (1959); H. R. 722, 85th Cong., 1st Sess. (1957); H. R. 5213, 84th Cong., 1st Sess. (1955).

It bears repeating, moreover, that none of these views—including Representative Patman's—focuses on the state purchases alleged here: purchases to gain competitive advantage in the private market rather than purchases for use in traditional governmental functions. For the Department of Justice's most recent statements regarding an exemption or immunity for state enterprises, see n. 37, *infra.*

## A

Respondents cite the hearings on the Robinson-Patman Act held in the late 1960's.[23] Testimony before the House Subcommittee investigating practices in the pharmaceutical industry indicated that the Act did not cover price discrimination in favor of state hospitals,[24] and Federal Trade Commission Chairman Paul Dixon disclaimed any authority over transactions involving state health care programs.[25] It

---

[23] The most important relevant event in the Robinson-Patman Act's postenactment history is the amendment in 1938 excluding eleemosynary institutions, 52 Stat. 446, 15 U. S. C. § 13c. Whether the existence of an exemption in § 13c supports an exemption for certain state purchases depends upon whether § 13c is interpreted to apply to state agencies that perform the functions listed. That is a substantial issue in its own right. Compare H. R. Rep. No. 1983, 90th Cong., 2d Sess., 7–8, 78 (1968) (suggesting that § 13c does not include government agencies), with 81 Cong. Rec. 8706 (1937) (remarks of Rep. Walter) (§ 13c would apply to institutions financed by cities, counties, and States). See also *City of Lafayette*, 435 U. S., at 397, n. 14 (§ 13c includes "public libraries," which "are, by definition, operated by local government"); *Abbott Laboratories*, 425 U. S., at 18, n. 10; 81 Cong. Rec. 8705 (1937) (remarks of Rep. Walter) (exemption codifies the intention of the drafters of the Robinson-Patman Act). We need not address this issue here.

[24] See, *e. g.*, Small Business and the Robinson-Patman Act: Hearings before the Special Subcommittee on Small Business and the Robinson-Patman Act of the House Select Committee on Small Business, 91st Cong., 73–77 (1969–1970) (William McCamant, Director of Public Affairs, National Association of Wholesalers); *id.*, at 623 (Harold Halfpenny, counsel for the Automotive Service Industry Association); Small Business Problems in the Drug Industry: Hearings before the Subcommittee on Activities of Regulatory Agencies of the House Select Committee on Small Business, 90th Cong., 15–16 (1967–1968) (hereinafter 1967–1968 Hearings) (Earl Kintner, former FTC Commissioner, counsel for the National Association of Retail Druggists) (state purchases "probably" exempt). But see *id.*, at 80 (remarks of Charles Fort, President, Food Town Ethical Pharmacies, Inc.) ("Robinson-Patman Act may prohibit this practice"); *id.*, at 86 (same). There also was testimony that institutional purchasers frequently obtain drugs at lower prices than do retail pharmacies, see *id.*, at 14, 258, 318, 1093–1094, and many witnesses complained that this discrimination adversely affected competition, see *id.*, at A–140 to A–141, 253–262, 273, 292.

[25] See H. R. Rep. No. 1983, *supra* n. 23, at 74.

is not at all clear, however, whether Chairman Dixon contemplated cases in which the state agency competed with private retailers, although he was aware of such practices by institutional purchasers.[26]  Other statements expressed little more than informed, interested opinions on the issue presented, and are not entitled to the consideration appropriate for the constructions given contemporaneously with the Act's passage.[27]  See *supra,* at 159–162, and n. 22.

It is clear from the House Subcommittee's conclusions that it did not focus on the question presented by this case.  The Subcommittee found that the difference between drug prices for retailers and government customers "is extremely substantial" and "not always fully explainable by either cost justifiable quantity discounts, economies of scale, or other factors inherent in bulk distribution."  H. R. Rep. No. 1983, 90th Cong., 2d Sess., 77 (1968).  In the next conclusion, it stated that "[n]umerous acts and policies of individual manufacturers seem . . . violative of the Robinson-Patman

---

[26] After hearing his testimony, the Subcommittee posed further questions for Chairman Dixon about the eroding influence on the retail druggists' market presented by: (i) expanding federal, state, and private group health care programs; (ii) the Federal Government's ability to purchase from drug manufacturers at prices substantially below wholesale cost; and (iii) instances of hospitals, "both nonprofit and proprietary, selling to outpatients or even nonpatients." *Id.,* at 73.  In his response to the Subcommittee, Chairman Dixon declined to discuss further the last category, which involved § 13c issues. *Id.,* at 74.  His disclaimer of FTC authority envisioned state purchases for welfare programs, not for resale in competition with private enterprise.  Thus, the issue presented here is most similar to the issue *not* discussed by Chairman Dixon.

[27] Assuming that this postenactment commentary before the Subcommittee can be imputed to Congress—quite a leap given the failure of the Subcommittee Report to rely on it for its conclusions—"the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States* v. *Price,* 361 U. S. 304, 313 (1960).  See, *e. g., Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 117–118, and n. 13 (1980); *Oscar Mayer & Co.* v. *Evans,* 441 U. S. 750, 758 (1979); *United Air Lines, Inc.* v. *McMann,* 434 U. S. 192, 200, n. 7 (1977) ("Legislative observations 10 years after passage of the Act are in no sense part of the legislative history").

Act . . . ." *Ibid.* Thus, it is quite possible that the Subcommittee considered some state purchasing at discriminatory prices—about which it had heard testimony—to be unlawful. The Subcommittee Report did include the awkwardly worded statement: "There is no basis apparent . . . why the mandate of the Robinson-Patman Act should not be applied to discriminatory drug sales favoring nongovernmental institutional purchasers, profit or nonprofit, to the extent there is prescription drug competition at the retail level with disfavored retail druggists." *Id.*, at 79. This unexceptional opinion, however, simply says that *private* institutional purchases may not facilitate unfair retail competition through sales at discriminatory prices. The Subcommittee said nothing expressly about the unfair competition at issue in this case.[28]

## B

Respondents also argue that, without exception, courts considering the Act's coverage have concluded that it does not apply to government purchasers. They insist that no court has imposed liability upon a seller or buyer, under either § 2(a) or § 2(f), when the discriminatory price involved a sale to a State, city, or county. See Brief for Respondent Board of Trustees 31–32. There are serious infirmities in these broad assertions: (i) this Court has never held nor suggested that there is an exemption for state purchases;[29] (ii) the number of judicial decisions even *considering* the Act's applica-

---

[28] The Subcommittee also concluded that the 1938 amendment was "designed to afford immunity to private nonprofit institutions . . . to the extent the sales are for the nonprofit institution's 'own use,'" H. R. Rep. No. 1983, *supra* n. 23, at 78, but that would indicate more the construction of § 13c than it would the intent of the 1936 Congress.

[29] Indeed, our opinions suggest precisely the opposite. See *City of Lafayette, supra,* at 397, n. 14; *Abbott Laboratories, supra,* at 18–19, n. 10; *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508, 513 (1972).

tion to purchases by state agencies is relatively small;[30] (iii) respondents cite no Court of Appeals decision that has expressly adopted their interpretation of § 2 before the decision below; (iv) some of the District Court cases upon which respondents rely are simply inapposite;[31] (v) it is not clear that *any* published District Court opinion has relied solely on a state purchase exemption to dismiss a Robinson-Patman Act claim alleging injury as a result of government competition in the private market;[32] and (vi) there are several cases that

[30] The parties cite fewer than a dozen cases, many with unpublished opinions, that involve the application of the Robinson-Patman Act to state purchases. See nn. 31–33, *infra.* Cf. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 731 (1975) (affirming rule adopted by "virtually all lower federal courts facing the issue in the *hundreds* of *reported* cases presenting this question over the past quarter century") (emphasis added); *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S., at 200–201 (adopting consistent, "longstanding" construction of Robinson-Patman Act after "nearly four decades of litigation").

[31] See *Pacific Engineering & Production Co.* v. *Kerr-McGee Corp.*, 1974–1 Trade Cases ¶ 75,054, p. 96,742 (Utah 1974) (dicta) (involving Federal Government as ultimate purchaser) (relying on Attorney General's opinion as sole support), aff'd in part and rev'd in part, 551 F. 2d 790, 798–799 (CA10) (finding legitimate competition despite different prices), cert. denied, 434 U. S. 879 (1977); *Sachs* v. *Brown-Forman Distillers Corp.*, 134 F. Supp. 9, 16 (SDNY 1955) (Act inapplicable because there was no proof that sales affected plaintiff adversely), aff'd on opinion below, 234 F. 2d 959 (CA2) *(per curiam)*, cert. denied, 352 U. S. 925 (1956); *General Shale Products Corp.* v. *Struck Constr. Co.*, 37 F. Supp. 598, 602–603 (WD Ky. 1941) (finding no "sale" under the Act and alternatively holding the Act inapplicable because "[n]either the government nor a city in its purchase of property considered necessary for the purposes of *carrying out its governmental functions* is in competition with another buyer who may be engaged in *buying and reselling* that article") (emphasis supplied), aff'd, 132 F. 2d 425, 428 (CA6 1942) (expressly reserving issue whether Act applies to sales to state agency), cert. denied, 318 U. S. 780 (1943). The *Sachs* court also indicated, in dicta, that it was unclear whether the Act applied to state purchases. 134 F. Supp., at 16.

[32] Cf. *Mountain View Pharmacy* v. *Abbott Laboratories*, No. C–77–0094 (Utah, Sept. 6, 1977) (unpublished opinion) (consent by plaintiffs to dismiss with prejudice Act claims based on sales to state agencies), aff'd in part and

suggest that the Robinson-Patman Act *is* applicable to state purchases for resale purposes.[33] This judicial track record is in no sense comparable to the unbroken chain of judical decisions upon which this Court previously has relied for ascertaining a construction of the antitrust laws that Congress over a long period of time has chosen to preserve. See cases cited, n. 27, *supra.*

Respondents also seek support in the interpretations of various commentators and executive officials. But the most authoritative of these sources indicate that the question pre-

---

rev'd in part, 630 F. 2d 1383 (CA10 1980) (complaint insufficient because it failed to identify products or purchasers subject to discriminatory treatment); *Portland Retail Druggists Assn.* v. *Abbott Laboratories*, No. 71–543 (Ore., Sept. 11, 1972) (unpublished, oral opinion), vacated and remanded, 510 F. 2d 486 (CA9 1974) (§ 13c applied), vacated and remanded, 425 U. S. 1 (1976). One District Court has suggested in an alternative holding that there is an exemption for state purchases for nonconsumption use. *Logan Lanes, Inc.* v. *Brunswick Corp.*, No. 4–66–5, (Idaho, May 26, 1966) pp. 4–5 (unpublished opinion), aff'd, 378 F. 2d 212, 215–216 (CA9) (purchases by Utah State University within scope of § 13c; expressly declined to address "so-called governmental exemption"), cert. denied, 389 U. S. 898 (1967). All of these cases predate our decision in *City of Lafayette.*

[33] See *Burge* v. *Bryant Public School District*, 520 F. Supp. 328, 330–332 (ED Ark. 1980), aff'd, 658 F. 2d 611 (CA8 1981) *(per curiam); Champaign-Urbana News Agency, Inc.* v. *J. L. Cummins News Co.*, 479 F. Supp. 281, 286–287 (CD Ill. 1979) (although Act inapplicable to federal purchases, state agencies might face an opposite result), aff'd, 632 F. 2d 680 (CA7 1980); *A. J. Goodman & Son* v. *United Lacquer Manufacturing Corp.*, 81 F. Supp. 890, 893 (Mass. 1949). Other cases cut against *any* exemption for state purchases. See *Municipality of Anchorage* v. *Hitachi Cable, Ltd.*, 547 F. Supp. 633, 637–641 (Alaska 1982); *Sterling Nelson & Sons* v. *Rangen, Inc.*, 235 F. Supp. 393, 399 (Idaho 1964), aff'd, 351 F. 2d 851, 858–859 (CA9 1965), cert. denied, 383 U. S. 936 (1966); *Sperry Rand Corp.* v. *Nassau Research & Development Associates*, 152 F. Supp. 91, 95 (EDNY 1957). Cf. *Reid* v. *University of Minnesota*, 107 F. Supp. 439, 443 (ND Ohio 1952) (expressly not addressing whether state agency exempt from Act when engaged in a business in the same manner as other business corporations).

sented is unsettled;[34] others are not necessarily inconsistent with our holding;[35] and in some cases they support it.[36] Thus, Congress cannot be said to have left untouched a universally held interpretation of the Act.[37]

In sum, it is clear that postenactment developments—whether legislative, judicial, or in commentary—rarely have

[34] See 5A Z. Cavitch, Business Organizations § 105D.01[8][c] (1973 and Supp. 1982) (opinions "divided" whether Act is applicable); 4 J. von Kalinowski, Antitrust Laws and Trade Regulation § 24.06, p. 24–70 (1982) ("there is some conflict among the authorities as to whether sales to states and municipalities are covered by the Act"); *id.*, § 24.06[2]; E. Kintner, A Robinson-Patman Primer 203 (1970) ("Although [the Attorney General's] opinion appears to have settled the matter where the federal government is concerned, some controversy has arisen over the applicability of the act to purchases by state and local governments"); F. Rowe, Price Discrimination Under the Robinson-Patman Act § 4.12, p. 84 (1962).

[35] Some deal only with sales to the Federal Government. See Letter from Comptroller General to Robert F. Sarlo, Veterans Administration (July 17, 1973), reprinted in 1973–2 Trade Cases ¶ 74,642. Almost all fail to mention, much less decide, whether the Act applies to state purchases for *retail* sales. See Report of the Attorney General Under Executive Order 10936, Identical Bidding in Public Procurement 11 (1962).

[36] See 62 Cal. Op. Atty. Gen. 741 (1979); 47 N. C. Atty. Gen. 112, 115 (1977); [1948–1949] Ga. Op. Atty. Gen. 723, 727 (1949) (if state agency competes with private enterprise, it is subject to Act).

[37] In its 1977 Report of the Task Group on Antitrust Immunities, at 25, the Department of Justice stated:

"The mere fact that a state has authorized a state-owned enterprise to engage in commercial activity should not be sufficient to immunize all activities of the enterprise from the antitrust laws. That test removes the clearly sovereign activities of a state from the antitrust scrutiny of the federal government while holding the commercial activities of a state-owned enterprise to the same standards requir[ed] of all who engage in commercial transactions in the market." Reprinted in Antitrust Exemptions and Immunities: Hearings before the Subcommittee on Monopolies and Commercial Law of the House Committee on the Judiciary, 95th Cong., 1st Sess., 1890 (1977).

Cf. *Victory Transport Inc.* v. *Comisaria General de Abastecimientos y Transportes*, 336 F. 2d 354, 360–362 (CA2 1964) (the charter of a ship to haul grain by a state instrumentality not a sovereign activity that would justify applying the sovereign immunity doctrine).

considered the specific issue before us. There is simply no unambiguous evidence of congressional intent to exempt purchases by a State for the purpose of competing in the private retail market with a price advantage.[38]

## VI

The Robinson-Patman Act has been widely criticized, both for its effects and for the policies that it seeks to promote. Although Congress is well aware of these criticisms, the Act has remained in effect for almost half a century. And it certainly is "not for [this Court] to indulge in the business of policy-making in the field of antitrust legislation. . . . Our function ends with the endeavor to ascertain from the words used, construed in the light of the relevant material, what was in fact the intent of Congress." *United States* v. *Cooper Corp.*, 312 U. S. 600, 606 (1941).

"A general application of the [Robinson-Patman] Act to all combinations of business and capital organized to suppress commercial competition is in harmony with the spirit and impulses of the times which gave it birth." *South-Eastern Underwriters*, 322 U. S., at 553. The legislative history is replete with references to the economic evil of large organizations purchasing from other large organizations for resale in competition with the small, local retailers. There is no rea-

---

[38] The dissent of JUSTICE O'CONNOR relies in large part, not on the words of the statute, or its legislative history, but on assertions that a "general consensus [existed] in the legal and business communities that sales to governmental entities are not covered by the Robinson-Patman Act." *Post*, at 182. See also *post*, at 174 (STEVENS, J., dissenting). JUSTICE O'CONNOR is correct that some in the business and legal community did think that an exemption existed for all state purchases. See *post*, at 185–187, and nn. 19 and 20. But to say there is a "consensus" is to disregard the opinion of commentators, see n. 34, *supra;* the views expressed that the Act is applicable to state purchases, see *supra*, at 161, 162–163, n. 22, and 169, and n. 37; and the most recent, relevant opinion of the Department of Justice, see *supra*, at 169, and n. 37. It is more accurate to say that this was an unsettled question of federal law that demanded this Court's attention.

son, in the absence of an explicit exemption, to think that Congressmen who feared these evils intended to deny small businesses, such as the pharmacies of Jefferson County, Alabama, protection from the competition of the strongest competitor of them all.[39]  To create an exemption here clearly would be contrary to the intent of Congress.

## VII

We hold that the sale of pharmaceutical products to state and local government hospitals for resale in competition with private pharmacies is not exempt from the proscriptions of the Robinson-Patman Act.  The judgment of the Court of Appeals accordingly is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

While I join JUSTICE O'CONNOR's dissenting opinion, I believe an additional comment on the text of the Robinson-Patman Act may help to explain my vote.  For purposes of interpreting that statute, I think that federal, state, and local agencies are "purchasers," but that such governmental agencies are not engaged in "competition" with private parties even when they resell purchased goods to consumers who might otherwise have patronized a private retailer.  Both before and after the 1936 statute amended § 2 of the Clayton Act, the requirement of proving an adverse effect on "competition" played an important part in limiting the coverage of the statute.

It is universally agreed that federal purchases are not covered by the Act.  Even though it has always been obvious that primary line competition might be injured by discrimina-

---

[39] Under our interpretation, the Act's benefits would accrue, precisely as intended, to the benefit of small, private retailers.  See 1935 Hearings, at 261 (Teegarden recommending passage "for the protection of private rights").

tory prices on sales to the Federal Government, and also that goods sold to military post exchanges would normally be resold at a substantial discount, no one in the 1936 legislative deliberations questioned the inapplicability of the Act to these sales. The explanation, in my opinion, does not rest on the sovereign status of the Federal Government,* but rather on the assumption embodied in the Act that federal agencies do not compete with nongovernmental entities.

Mr. Teegarden, the lobbyist, made this assumption clear in his statement at the 1935 House hearings, quoted in part by the opinion of the Court. *Ante,* at 160–161, n. 19:

"Mr. LLOYD: Would this bill, in your judgment, prevent the granting of discounts to the United States Government?

.      .      .      .      .

"For instance, the Government gets huge discounts. Take that electric fan, for instance. You go to the ordinary store and the list price is $35. The Procurement Division procures them delivered, one at a time, for $13.18. Now, would that discount be barred by this bill?

"Mr. TEEGARDEN: I do not see why it should . . . .

"Aside from that, my answer would be this: The Federal Government is not in competition with other buyers

---

*When Mr. Teegarden responded to specific written questions about the Act, he gave two reasons why the bill would not prevent competitive bidding on government purchases below trade price levels. First, he stated that a statute would not be construed to restrict the rights, prerogatives, or privileges of the sovereign unless it expressly so provided. This reason would apply only to the Federal Government, as the Court's opinion points out. *Ante,* at 159–161, nn. 18, 19. In addition, however, Mr. Teegarden gave a reason that applies to governmental entities at state and local levels as well. "The further insertion of the clause proposed under topic 4 below, requiring a showing of effect upon competition, will further preclude any possibility of the bill affecting the Government." Hearings on H. R. 8442 et al. before the House Committee on the Judiciary, 74th Cong., 1st Sess., 250 (1935).

from these concerns.  Therefore a discrimination—it is so applied universally in interstate commerce law, in the railroad law—to have a discrimination, there must be a relative position between the parties to the discrimination which constitutes an injury to one as against the other.  I think the answer is to be found in that.

"In other words, if seller A makes a price to a retailer in New York and a different price to a retailer in San Francisco, all other things aside, no case of discrimination could be predicated there, because the two are not in the same sphere at all.

"The Federal Government is saved by the same distinction, not of location but of function.  They are not in competition with any one else who would buy."  Hearings on H. R. 8442 et al. before the House Committee on the Judiciary, 74th Cong., 1st Sess., 208–209 (1935).

I would interpret the "distinction, not of location but of function" somewhat more broadly than does the majority.  It is not merely a question of whether government agencies do or do not resell the goods they have purchased.  Even when they resell items to the public, governmental entities do not engage in competition with private retailers in the same sense that chainstores compete with independent retailers.  Most importantly, their activities are seldom affected by a profitmaking motivation; rather they are undertaken in connection with the provision of services to the public.  Further, their merchandising and price-setting decisions take a different set of factors into account.  As the Court notes, *ante,* at 158, n. 17, they need not include a profit component, their overhead may be subsidized, and they may be exempt from state or federal taxation.  In short, governmental agencies are in an entirely different category of market participants.

I am convinced that the same analysis applies to purchases and resales by state and local agencies.  I do not believe that a municipal hospital that operates a pharmacy is any more en-

gaged in competition with a retail druggist than a military post exchange is engaged in competition with a retail grocer or a retail clothing store. To be sure, this analysis is not entirely consistent with the conclusion implied by Mr. Teegarden's somewhat equivocal answer to Congressman Hancock. Although he did not say that purchases by a city hospital would be covered by the bill, he did state that, *"[i]f the two hospitals are in competition with each other,"* the fact that one was operated by the city would not save it from the bill. But he went on to stress: *"If they are not in competition with each other, then they are in a different sphere."* Hearings on H. R. 8442, *supra,* at 209 (emphasis added). In my view, if not in Mr. Teegarden's, the differences between a city hospital and a private hospital justify the conclusion that, for purposes of construing this statute, they should not be considered in competition with each other.

I therefore would hold as a matter of law that neither purchases nor sales by governmental agencies—federal, state, or local—constitute "competition" with private persons to which the statute has any application. The Act has no impact on any governmental agency's ability to provide hospital and related services to its constituents. For the reasons JUSTICE O'CONNOR has set forth in greater detail, I believe such a holding more accurately reflects the understanding of the Congress that enacted the statute and the lawyers and businessmen who have lived with the statute on a day-to-day basis for almost half a century.

JUSTICE O'CONNOR, with whom JUSTICE BRENNAN, JUSTICE REHNQUIST, and JUSTICE STEVENS join, dissenting.

The issue that confronts the Court is one of statutory construction: whether the Robinson-Patman Act covers purchases of commodities by state and local governments for resale in competition with private retailers.[1] The Court's

---

[1] This case does not require us to consider, as the cases cited by the majority suggest, *ante,* at 157–158, whether compliance with other federal

task, therefore, is to discern the intent of the 1936 Congress which enacted the Robinson-Patman Act. I do not agree with the majority that this issue can be resolved by reference to cases under the Sherman Act or other statutes, or by reliance on the broad remedial purposes of the antitrust laws generally. The 1936 Congress simply did not focus on this issue. The business and legal communities have assumed for the past four decades that such purchases are not covered. For these reasons, as explained more fully below, I respectfully dissent.

## I

## A

The majority relies extensively on the interpretation this Court has given to the term "person" under the Sherman Act and other statutes as a guide to whether the terms "person" and "purchasers," as used in § 2 of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act (Act), 49 Stat. 1526, 15 U. S. C. § 13, include state and local governmental entities. See *ante*, at 155–156. In my view, such reliance is misplaced. The question of the Robinson-Patman Act's treatment of governmental purchases requires an independent examination of the legislative history of *that* Act to ascertain congressional intent.[2] Indeed, the cases cited by the major-

---

statutes necessitates an implied exemption from the provisions of the Act. The question is simply one of congressional intent—*i. e.*, what Congress intended when it enacted the Robinson-Patman Act with respect to coverage of governmental purchases for resale.

[2] The majority cites *Pfizer Inc.* v. *Government of India*, 434 U. S. 308 (1978), as a case in which the Court applied Sherman Act cases to construe the Clayton Act, which the Robinson-Patman Act amends. *Ante*, at 157, n. 15. In *Pfizer* the Court held that a foreign nation is a "person" entitled to bring a treble damages action under § 4 of the Clayton Act, 15 U. S. C. § 15. As the Court acknowledged, 434 U. S., at 311, § 4 is a reenactment of the virtually identical language of § 7 of the Sherman Act. In fact, § 7 was eventually repealed as redundant. § 3, 69 Stat. 283; see S. Rep. No. 619, 84th Cong., 1st Sess., 2 (1955). Reliance on prior interpretation of § 7 of the Sherman Act was therefore uniquely appropriate.

ity emphasize that the key question regarding coverage or noncoverage of governmental entities is the intent of Congress *in enacting the statute in question.*[3]    Resolution of the statutory construction question cannot be made to depend upon the abstract assertion that the term "person" is broad enough to embrace States and municipalities.[4]    For these

---

[3] See *Pfizer Inc.* v. *Government of India, supra,* at 315 (§ 4 of the Clayton Act) ("The word 'person' . . . is not a term of art with a fixed meaning wherever it is used, nor was it in 1890 when the Sherman Act was passed"); *Georgia* v. *Evans,* 316 U. S. 159, 161 (1942) (§ 7 of the Sherman Act) ("Whether the word 'person' . . . includes a State or the United States depends upon its legislative environment"); *Ohio* v. *Helvering,* 292 U. S. 360, 370 (1934) (Rev. Stat. §§ 3140, 3244) ("Whether the word 'person' or 'corporation' includes a state . . . depends upon the connection in which the word is found").    See also *United States* v. *Cooper Corp.,* 312 U. S. 600, 604–605 (1941) ("[T]here is no hard and fast rule of exclusion.    The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate intent, by the use of the term, to bring state or nation within the scope of the law").

It is also worth noting that many of the cases upon which the majority relies involved construction of the term "person" for the purpose of determining whether a particular governmental entity is a "person" entitled *to sue.    Pfizer Inc.* v. *Government of India, supra; United States* v. *Cooper Corp., supra* (United States is not "person" entitled to sue under § 7 of the Sherman Act); *Georgia* v. *Evans, supra* (State is "person" entitled to sue under § 7 of the Sherman Act); *Chattanooga Foundry & Pipe Works* v. *City of Atlanta,* 203 U. S. 390 (1906) (municipality is "person" entitled to sue under § 7 of the Sherman Act).

[4] I would also note that the majority overstates the significance of Senator Robinson's remarks in connection with its observation that "[t]he word 'purchasers' has a meaning as inclusive as the word 'person.'" *Ante,* at 155, n. 11.    The remarks of Senator Robinson should not be read to suggest that the word "purchasers," as used in the Robinson-Patman Act, embraces States or municipalities.    The Senator's observation reflects an affirmative response to Senator Vandenberg's concern that, although the bill was drafted with a view toward the problems of large chain-store buying power in the retail merchandising field, the Act would apply to *private* enterprise in the field of industrial production as well.    See 80 Cong. Rec. 6429–6430 (1936).

reasons, the mere fact that in *City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 397, n. 14 (1978), a Sherman Act case, the Court referred to the Robinson-Patman Act in its discussion of the breadth of the term "person" cannot resolve the question now before us.

Further, the majority opinion propounds a misleading syllogism when it (1) suggests that the term "person" in the Clayton and Robinson-Patman Acts should be construed similarly, (2) cites *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251 (1972), for the proposition that the Clayton Act applies to States, and (3) then opines that the terms "person" and "purchasers" under § 2 therefore should be construed to include state purchases. *Ante*, at 155–156. Because, as the majority observes, *ante*, at 156, n. 13, the definitional section of the Clayton Act, 15 U. S. C. § 12, was intended to apply to the Robinson-Patman Act, I do not dispute the first proposition. However, *Hawaii* v. *Standard Oil Co.* stated only that a State is a "person" for purposes of *bringing* a treble damages action under § 4 of the Clayton Act. 405 U. S., at 261.[5] Conspicuously absent from the majority's discussion is any authority holding that States or local governments are persons for purposes of exposure to *liability* as purchasers under the provisions of the Clayton Act.[6] Although Congress

---

[5] Were Congress to consider the specific question of *liability* of governmental entities as purchasers under the Robinson-Patman Act, it seems reasonable to assume that it would approach that question with a different set of policy concerns than those bearing on the decision whether to extend the benefit of the Act's protections to those entities. Cf. *Parker* v. *Brown*, 317 U. S. 341, 351 (1943) ("In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress").

[6] Indeed, one basis for the United States Attorney General's conclusion in 1938 that the Robinson-Patman Act is inapplicable to purchases of supplies by the Federal Government was the absence of any judicial decision construing the Clayton Act, prior to its amendment by the Robinson-

might now decide that the purchasing activities of States and local governments *should* be subject to the limitations imposed by § 2, that is a policy judgment appropriately left to legislative determination.

## B

Nor do I find persuasive the majority's invocation of presumptions regarding the liberal construction and broad remedial purposes of the antitrust laws generally. Without derogating the usefulness of those principles or suggesting that they should never play a role in the Robinson-Patman context, one may nevertheless candidly acknowledge that the Court also has identified a certain tension between the Robinson-Patman Act, on the one hand, and the Sherman Act and other antitrust statutes, on the other. The Court frequently has recognized that strict enforcement of the anti-price-discrimination provisions of the former may lead to price rigidity and uniformity in direct conflict with the goals of the latter. See, *e. g.*, *Great Atlantic & Pacific Tea Co.* v. *FTC*, 440 U. S. 69, 80, 83, n. 16 (1979); *Automatic Canteen Co.* v. *FTC*, 346 U. S. 61, 63, 74 (1953); *Standard Oil Co.* v. *FTC*, 340 U. S. 231, 249, and n. 15 (1951).[7]

---

Patman Act, to apply to governmental contracts. 38 Op. Atty. Gen. 539, 540 (1936).

Prior to 1929, courts interpreted the original § 2 as addressed only to the problem of primary line competition—*i. e.*, injury to competition among sellers. See, *e. g.*, *National Biscuit Co.* v. *FTC*, 299 F. 733 (CA2), cert. denied, 266 U. S. 613 (1924). Not until 1929 did this Court hold that § 2 also protected against the type of injury alleged in the present case—*i. e.*, secondary line injury, or injury to competition among buyers. See *George Van Camp & Sons Co.* v. *American Can Co.*, 278 U. S. 245, 253 (1929). The Robinson-Patman amendment to § 2 clarified that the Act was designed to redress the latter type of injury.

[7] Indeed, the tension between the Robinson-Patman policy of protection of competitors and the Sherman Act goal of protection of the competitive process has prompted the Court to achieve a partial reconciliation of the two by liberal interpretation of the "meeting competition" defense under § 2(b) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. § 13(b). See *Standard Oil Co.* v. *FTC*, 340 U. S., at 251.

At the very least, this recognition raises doubts that the Court should liberally construe the Robinson-Patman Act in favor of broader coverage. Those doubts are enhanced by the fact that Congress' principal aim in enacting the Robinson-Patman Act was to protect small retailers from the competitive injury suffered at the hands of large chain stores.[8] It is consistent with that intent for Congress also to have displayed special solicitude for the well-established, below-trade price-buying practices of governmental institutions.

## II

As the majority documents, *ante*, at 160, n. 19, the legislative history of the Robinson-Patman Act clearly indicates that Congress envisioned *some* sort of immunity for governmental bodies.[9] The question before the Court is the extent

---

[8] H. R. Rep. No. 2287, 74th Cong., 2d Sess., pt. 1, pp. 3–4 (1936); S. Rep. No. 1502, 74th Cong., 2d Sess., 4 (1936); see FTC, Final Report on the Chain Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess. (1935).

[9] Members of the House expressed concern with the effect of the bill on the established below-market buying practices of federal, *state, county, and municipal governments.* Hearings on H. R. 8442 et al. before the House Committee on the Judiciary, 74th Cong., 1st Sess., 209 (1935). In response H. B. Teegarden, a principal draftsman of the Act, assured members of the House Judiciary Committee that he "would not want" the Act if it prohibited, all along the line, the competitive bidding practices of those governments. *Ibid.*

Moreover, with respect to subsequent legislative history, I find significant the fact that later attempts in Congress to expressly include governmental entities within the coverage of the Act failed. See H. R. 4452, 82d Cong., 1st Sess. (1951); H. R. 3377, 83d Cong., 1st Sess. (1953); H. R. 5213, 84th Cong., 1st Sess. (1955); H. R. 722, 85th Cong., 1st Sess. (1957); H. R. 155, 86th Cong., 1st Sess. (1959); H. R. 430, 87th Cong., 1st Sess. (1961). In particular, I would not dismiss as readily as does the majority, *ante*, at 163, n. 22, the bills introduced by Representative Patman in 1951 and 1953 to amend the Act to define "purchaser" to include "the United States, any State or any political subdivision thereof." The majority speculates that Representative Patman introduced these bills to reaffirm his original intent that these entities would be covered. In light of Representative Patman's agreement in his book, W. Patman, The Robinson-Patman Act 168 (1938), with the United States Attorney General's con-

of that immunity—in particular, whether the purchase of goods by state and local governments for resale in competition with private retailers is within the intended scope of the Robinson-Patman Act. As the majority acknowledges, *ante*, at 159, the 1936 Congress that enacted the Robinson-Patman Act did not focus on the precise issue before the Court. Notwithstanding this admission, the majority announces the surprising conclusion that "[t]o create an exemption here *clearly* would be contrary to the intent of Congress." *Ante*, at 171 (emphasis added).

The majority is correct in stating that it is not the business of this Court to engage in "'policy-making in the field of antitrust legislation'" in order to fill gaps where Congress has not clearly expressed its intent. *Ante*, at 170 (quoting *United States* v. *Cooper Corp.*, 312 U. S. 600, 606 (1941)). It is precisely because I concur in that admonition that I would refrain from attributing to Congress an intent to cover the state and local governmental purchases in question here.[10]

struction of the Act to exclude purchases by the Federal Government and his extension of the Attorney General's rationale to "municipal and public institutions," *ibid.*, it is more plausible to infer that he viewed the bills as *extending* the Act's coverage.

[10] My resolution of the statutory issue here should not be construed to reflect a policy judgment that the Robinson-Patman Act *should* protect "a State's entrepreneurial personality." *City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 422 (1978) (BURGER, C. J., concurring in part). We are not concerned here with whether the kind of activity in which these governmental entities are engaged *appropriately* exposes them to antitrust liability under the Act. Cf. *id.*, at 418. That question raises policy concerns lying peculiarly within the institutional province of Congress. "A court, without the benefit of legislative hearings that would illuminate the policy considerations if the question were left to Congress, is not competent in my opinion to resolve this question . . . . It is regrettable that the Court today finds it necessary to rush to this essentially legislative judgment." *Pfizer Inc.* v. *Government of India*, 434 U. S., at 331 (POWELL, J., dissenting) (footnote omitted). Because the question before us is one of congressional intent and it is far from clear that Congress has supplied an answer to that question, I would refrain from substituting the policy judgments of the judiciary for those Congress might embrace.

## A

In attempting to supply the unexpressed intent of Congress, the majority fails to offer satisfactory guidelines for determining the scope of the Act's coverage of governmental agencies.[11] The majority assumes, "without deciding, that Congress did not intend the Act to apply to state purchases for consumption in traditional governmental functions" and suggests that state purchases of pharmaceuticals for the purpose of resale to indigent citizens may not expose the State to antitrust liability. *Ante*, at 154, and n. 7.

The majority's assumption, however, is inconsistent with the principles of statutory construction upon which it purports to rely. If, absent a clear expression of legislative intent to the contrary, the plain language of the statute controls, then by the majority's own assertions one would have to conclude that even purchases for the State's own use or for resale to indigents would fall within the Act's proscriptions. For, as the majority remarks, *ante*, at 155, the terms "person" and "purchasers" are broad enough to include governmental entities, and the legislative history is "ambiguous on the application of the Act to state purchases for consumption . . . ." *Ante*, at 160–161.

Moreover, to the extent the majority implies that a State's coverage or noncoverage under the Act turns on the distinction between purchases for resale and purchases for consumption,[12] that distinction is inconsistent with the compe-

Cf. *id.*, at 320 (BURGER, C. J., dissenting); *id.*, at 330–331 (POWELL, J., dissenting).

[11] To the extent the majority purports to "divine" the will of Congress, it comes as no surprise, given Congress' inattention to this precise question, that no "bright lines" for coverage and noncoverage emerge from its opinion.

[12] The majority thus suggests, though it refrains from holding, that the scope of coverage under § 2(a) is coextensive with the "for their own use" line drawn by the Nonprofit Institutions Act of 1938, 15 U. S. C. § 13c, and interpreted by the Court in *Abbott Laboratories* v. *Portland Retail Druggists Assn., Inc.*, 425 U. S. 1 (1976). This proposed resale/consumption

182

tition rationale elsewhere suggested, *ante*, at 170, to underlie the prohibitions of § 2(a). For example, a state university hospital might limit the use of its pharmacy to its own faculty and staff, thereby falling within the "for their own use" exception.[13]   Nevertheless, the university pharmacy may be inflicting competitive injury on private pharmacies that the university's faculty and staff might otherwise patronize.[14] Thus, the majority's conflicting suggestions leave in doubt what principle—the presence of functional competition or the consumption/resale dichotomy—guides the determination whether a state or local government's purchases fall within the Act's proscriptions.

B

Against the backdrop of a legislative history that even the majority concedes does not focus on the issue before us stands the general consensus in the legal and business communities that sales to governmental entities are not covered by the Robinson-Patman Act.   The majority devotes considerable effort to distinguishing or undercutting the authorities cited by the respondents.   In so doing, and in observing that these authorities cannot reveal Congress' intent in 1936, *ante*, at 165, n. 27, the majority misunderstands the significance of this evidence.   These authorities simply illustrate the virtually unanimous assumption over the past 47 years of noncoverage of governmental entities—an assumption that has served as the basis of well-established governmental pur-

---

distinction has no foundation in the language of § 2(a), which prohibits discrimination "in price between different purchasers of commodities . . . , where such commodities are sold *for use, consumption, or resale . . . .*" 15 U. S. C. § 13(a) (emphasis added).

[13] See *Abbott Laboratories* v. *Portland Retail Druggists Assn., Inc.*, *supra*, at 16–17.

[14] Or, to take another example, a cafeteria operated by a governmental agency for the benefit of its employees also might inflict some competitive injury on restaurants in the same area that otherwise might enjoy the employees' patronage.

chasing practices and marketing relationships. In the past the Court has relied upon the widespread understanding of the provisions of the Robinson-Patman Act in limiting the scope of the Act's prohibitions.[15] To do so here is no less appropriate.

Despite its attempt to discount the significance of the judicial authorities cited by the respondents, the majority cannot dispute that no court has imposed liability upon a seller or buyer, under either § 2(a) or § 2(f), 15 U. S. C. §§ 13(a) and (f), in a case involving an alleged price discrimination in favor of a federal, state, or municipal governmental purchaser.[16]

---

[15] See *Standard Oil Co.* v. *FTC*, 340 U. S., at 246–247 (reliance on widespread understanding that the meeting-competition proviso of § 2(b) of the Clayton Act, as amended by the Robinson-Patman Act, provides a complete defense to a charge of price discrimination).

[16] See *Champaign-Urbana News Agency, Inc.* v. *J. L. Cummins News Co.*, 632 F. 2d 680, 688–689 (CA7 1980) (Robinson-Patman Act inapplicable to purchases by instrumentality of Federal Government for resale); *Mountain View Pharmacy* v. *Abbott Laboratories*, No. C–77–0094 (Utah, Sept. 6, 1977) (unpublished opinion) (order of consent dismissing with prejudice Robinson-Patman claims based on sales to any governmental entity), aff'd in part and rev'd in part on other grounds, 630 F. 2d 1383 (CA10 1980); *Logan Lanes, Inc.* v. *Brunswick Corp.*, No. 4–66–5 (Idaho, May 26, 1966) (unpublished opinion) (sale of bowling equipment to State not within provisions of Act; alternative holding that sales exempt under 15 U. S. C. § 13c), aff'd, 378 F. 2d 212, 217 (CA9) (sales to state university within § 13c exemption), cert. denied, 389 U. S. 898 (1967); *Sperry Rand Corp.* v. *Nassau Research & Development Associates*, 152 F. Supp. 91, 96 (EDNY 1957) (disclaiming, on motion for reargument, any intention that original opinion could be "construed to suggest that sales to the Government can be thought to be subject to the provisions of the Robinson-Patman Act"); *Sachs* v. *Brown-Forman Distillers Corp.*, 134 F. Supp. 9, 16 (SDNY 1955) ("It is doubtful at best whether the Robinson-Patman Act applies at all to sales to Government agencies, state or federal") (holding Act inapplicable to sales by liquor distiller to state liquor commissions; alternative holding that no competitive injury suffered by plaintiff liquor wholesaler), aff'd on opinion below, 234 F. 2d 959 (CA2), cert. denied, 352 U. S. 925 (1956); *General Shale Products Corp.* v. *Struck Constr. Corp.*, 37 F. Supp. 598, 602–603 (WD Ky. 1941) (alternatively holding Robinson-Patman Act inapplicable to sales to municipal housing com-

Commentators confirm the general judicial consensus that sales to States and municipalities are not covered by the Act.[17] Moreover, Congress' failure to enact bills extending

mission and suggesting that "the Act does not apply to sales to the government, state or municipalities"), aff'd, 132 F. 2d 425 (CA6 1942), cert. denied, 318 U. S. 780 (1943).

While one may concede that most of these cases do not focus on the precise situation of purchases by state or local governments for resale, they nonetheless reflect the consensus of judicial opinion that governmental bodies are not subject to liability under § 2 of the Clayton Act, as amended by the Robinson-Patman Act. The majority would dismiss many of these cases with the simple observation that they predate the Court's decision in *City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389 (1978). *Ante*, at 167–168, n. 32. For reasons already noted, however, in my view *City of Lafayette* does not resolve the issue before us in this case.

Moreover, cases that the majority suggests are supportive of its position, *ante*, at 168, n. 33, are similarly distinguishable. For example, both *Municipality of Anchorage* v. *Hitachi Cable, Ltd.*, 547 F. Supp. 633 (Alaska 1982), and *Sterling Nelson & Sons, Inc.* v. *Rangen, Inc.*, 235 F. Supp. 393 (Idaho 1964), aff'd, 351 F. 2d 851, 858–859 (CA9 1965), cert. denied, 383 U. S. 936 (1966), indicate only that the Robinson-Patman Act may apply where the State, as in *Sterling*, or the municipality, as in *Hitachi*, is the *victim* of commercial bribery under § 2(c), 15 U. S. C. § 13(c), rather than the favored customer.

[17] E. Kintner, A Robinson-Patman Primer 224 (2d ed. 1979) ("In spite of [any] contrary indications [among state attorneys general], it is generally believed that the exemption applies to governmental purchases at any level"); W. Patman, Complete Guide to the Robinson-Patman Act 30 (1963) (indicating the Act is inapplicable to sales to government, municipal, or public institutions); F. Rowe, Price Discrimination Under the Robinson-Patman Act 84 (1962) ("The preponderance of reasoned opinion treats State or municipal bodies on a par with the Federal Government's exemption"); 4 J. von Kalinowski, Antitrust Laws and Trade Regulation § 24.06, p. 24–70 (1982) ("[T]he prevailing view is that such sales [to States and municipalities] are excluded from Robinson-Patman liability"). See also 5A Z. Cavitch, Business Organizations § 105D.01[8][c] (1973) (indicating that lower federal courts have generally held the Act inapplicable to sales to States and municipalities, that one lower federal court has held the Act may be applicable if the State is the disfavored customer, and that opinions among state attorneys general are divided).

Although not specifically addressing any consumption/resale distinction, a past Attorney General of the United States also has opined that pur-

Robinson-Patman coverage to these entities buttresses this interpretation of the Act. See n. 9, *supra*.

This same understanding has been expressed in testimony before Congress. In 1967 and 1968 a congressional Subcommittee conducted public hearings on the problems of small businesses in the pharmaceutical industry. The Subcommittee heard testimony from both representatives of pharmaceutical manufacturers and retail pharmacists regarding the industrywide practice of price discrimination in sales of pharmaceuticals to governmental purchasers—federal, state, county, and municipal.[18] Several witnesses also directly expressed their assumption that the Robinson-Patman Act does not apply to such sales.[19]

chases by state and local governments are not within the Act's prohibition against price discrimination. Report of the Attorney General Under Executive Order 10936, Identical Bidding in Public Procurement 11 (1962) (identical bidders on contracts with state and local governments cannot contend that the Act prohibits bidding below the schedule price, because the Act is not applicable to government contracts).

[18] Small Business Problems in the Drug Industry: Hearings before the Subcommittee on Activities of Regulatory Agencies of the House Select Committee on Small Business, 90th Cong., 1st Sess., 48 (1967–1968) (hereinafter 1967–1968 Hearings) (Merritt Skinner, community pharmacist); *id.*, at 258 (William Apple, executive director of the American Pharmaceutical Association); *id.*, at 296, 318–319 (Hyman Moore, H. L. Moore Drug Exchange, Inc.); *id.*, at 500 (Henry DeBoest, vice president of Eli Lilly & Co.); *id.*, at 705 (Donald van Roden, vice president and general manager of pharmaceutical operations for Smith Kline & French Laboratories); *id.*, at 792 (Joseph Ingolia, vice president and general manager of Schering Laboratories); *id.*, at 817 (Lyman Duncan, vice president of American Cyanamid Co.).

Based upon this overwhelming evidence, the Select Committee on Small Business concluded in its Report to the House: "The difference between drug prices charged retailers and wholesalers as compared to those charged . . . governmental customers is extremely substantial, often being over 50 percent." H. R. Rep. No. 1983, 90th Cong., 2d Sess., 77 (1968).

[19] See 1967–1968 Hearings, at 15–16 (Earl Kintner, former FTC Commissioner, counsel for the National Association of Retail Druggists) ("When a drug supplier sells drugs to Federal, State, or municipal government institutions, the price charged by the supplier may be without regard to the Robinson-Patman Act, because such sales are probably exempt from the

In 1969 and 1970, the same House Subcommittee investigated the problems of small businessmen under the Robinson-Patman Act. In these hearings witnesses again expressed the view that governmental purchases at any level are not covered, highlighting the problem of favorable prices on governmental purchases *for resale* and making a plea for a change in the law.[20]

---

Robinson-Patman Act"); *id.*, at 731 (W. Abrahamson, president of Ortho Pharmaceutical Corp.) ("[T]he only special pricing we have ever engaged in are *[sic]* in bidding situations to [federal, state, or local government] agencies excluded from the Robinson-Patman Act"); *id.*, at 1069 (C. Stetler, president of the Pharmaceutical Manufacturers Association) ("There is nothing immoral or unlawful about incremental cost pricing in cases—such as sales to the Government . . . —where the Robinson-Patman Act does not apply").

Even one Congressman on the Subcommittee expressed his understanding that the Act does not apply to governmental purchasers. See *id.*, at 1092 (Rep. Corman) ("[I]f there were no exemption under Robinson-Patman for the Government . . . , what would be the situation as to their purchases?"). The colloquy that followed Representative Corman's question further evidences the assumption that governmental purchases are outside the scope of the Act, *even in the case of resales.*

"Mr. STETLER. If there was no exemption under Robinson-Patman, I presume some of these practices would be illegal under Robinson-Patman.

"Mr. CUTLER. If I could try to answer that, [Representative] Corman. . . .

"[A]bsent the one case of these resales . . . , I suppose the lack of exemption would make no difference, because the Robinson-Patman Act would not apply for other reasons, because you are not discriminating between two people engaged in commerce and competing with one another.

"Further, there is a real question as to whether the Robinson-Patman Act applies *under any circumstances* where you are bidding under a competitive bid. So for both of these reasons, the answer to your question would be that the same pricing practices might still lawfully prevail under Robinson-Patman without *the exemption for the government . . . ." Ibid.* (emphasis added).

[20] William McCamant, Director of Public Affairs for the National Association of Wholesalers, testified:

"Over the years, the Robinson-Patman Act has not been extended to cover sales to the Government. In the days when Government purchases

## III

The legislative history of the Robinson-Patman Act clearly reveals that Congress intended to exclude governmental entities from the Act's proscriptions to some extent. However, Congress did not focus on the issue before us and therefore did not provide a clear rationale governing coverage and noncoverage. In an area in which bright lines are needed to guide state and local governments in their purchasing practices, the majority fails to identify any principle triggering inclusion or exclusion.

---

constituted a relatively small volume in the marketplace, this exemption posed few problems. But today, with the vast growth in Government purchases, Federal, State, and local, . . . the continued exemption creates many unfair competitive situations.

.           .           .           .           .

"We believe that Congress must turn its attention to this problem." Small Business and the Robinson-Patman Act, Hearings before the Special Subcommittee on Small Business and the Robinson-Patman Act of the House Select Committee on Small Business, 91st Cong., 1st Sess., 73–74 (1969–1970).

See *id.*, at 76–77 (Everette MacIntyre, Acting Chairman of the Federal Trade Commission) (affirming that sales to the Federal Government, even in the resale context, are not subject to the Robinson-Patman Act).

Harold Halfpenny, legal counsel for the Automotive Service Industry Association, focused most precisely on the problem of which petitioners complain—*i. e.*, competitive injury to private industry when governmental entities receive more favorable prices on purchases of commodities for resale.

"[W]hile the Act is silent on the subject, its legislative history and subsequent interpretation support the proposition that sales made to Federal or *State governmental bodies* are not subject to the provisions of the Act.

"This may be injurious to competition in several ways. . . .

"[T]here are '*second line*' *situations where competition exists between the Government and private industry in the resale of commodities.*

.           .           .           .           .

"The Federal Trade Commission has not recommended legislation to make the Robinson-Patman Act applicable to sales to governmental purchases. However, in our opinion, Congress should consider acting on its own volition." *Id.*, at 623 (emphasis added).

Moreover, one cannot doubt that state, county, and municipal governments and manufacturers of commodities have structured their marketing relationships with each other on the longstanding assumption that the Robinson-Patman Act does not apply to those transactions. That understanding finds substantial support among the courts and commentators. State and local governments have developed programs for providing services to the public, including medical care to the indigent and the medically needy,[21] based on the same assumption. The majority's holding that sales of commodities to state and local governments for resale in competition with private enterprise are covered by the Act will engender significant disruption—not only through government and industry reexamination and restructuring of marketing relationships, but also, unfortunately, through possible termination of services and supplies to needy citizens[22] and through litigation associated with the process of reexamination.[23] The Court rests its decision primarily on one statement in the legislative history,[24] taken in isolation from other remarks designed to assure concerned House Members that

---

[21] See, e. g., Cal. Welf. & Inst. Code Ann. §§ 14100–14126 (West 1980 and Supp. 1982); Ill. Ann. Stat., ch. 23, ¶¶ 5–1 to 5–14 (Supp. 1982–1983); Mont. Code Ann. §§ 53–6–103 to 53–6–144 (1981); N. Y. Soc. Serv. Law §§ 365, 365–a (McKinney 1976 and Supp. 1982–1983); Tex. Human Res. Code Ann. §§ 32.001–32.037 (1980); Va. Code §§ 63.1–134 to 63.1–140 (1980).

[22] The administrative burden of developing internal accounting and recordkeeping procedures to segregate commodities purchased for resale, plus the additional financial strain of paying higher prices for these purchases, may induce state and local governments to terminate programs and services already in place. More significantly, however, the uncertainty generated by the majority's failure to establish clear lines of demarcation for coverage and noncoverage and the fear of exposure to treble-damages liability might well cause cautious legislators facing budgetary dilemmas to eliminate these programs.

[23] I note that the Court has not indicated that today's holding will have only prospective effect.

[24] See ante, at 161.

the Act would *not* force the abandonment of governmental below-market buying practices which the majority's holding now calls into question. Given Congress' failure to delineate the extent of the Robinson-Patman Act's coverage or noncoverage of state and local governments, I would allow Congress to speak on this issue rather than disrupt long-standing practices and programs and judicially arm private litigants with a powerful treble-damages action against these governments. Therefore, I would affirm the judgment below.