The PROGRESSIVE CORPORATION
AND SUBSIDIARIES, Plaintiff–
Appellee,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 91–3578.

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1992.

Decided July 22, 1992.

Rehearing Denied Aug. 25, 1992.

Richard Katcher (argued and briefed), Peter W. Vogt, Alexander J. Szilvas, Baker & Hostetler, Cleveland, Ohio, for plaintiff-appellee.

Daniel M. Houlf, Trial Atty., U.S. Dept. of Justice, Tax Div., Washington, D.C., Annette G. Butler, Asst. U.S. Atty., Cleveland, Ohio, Gary R. Allen, Acting Chief (briefed), Kenneth L. Greene, Charles Bricken (argued), U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for defendant-appellant.

Before: MILBURN and NORRIS, Circuit Judges; and ENGEL, Senior Circuit Judge.

MILBURN, Circuit Judge.

Defendant United States of America appeals from the summary judgment granted by the district court in favor of plaintiff, The Progressive Corporation and Subsidiaries ("Progressive"), which awarded Progressive a tax refund of $2,191,595 plus interest from the date the taxes were paid. On appeal, the principal issues are (1) whether Progressive's simultaneous purchases of a stock and a put option on the same stock resulted in a holding period of zero under 26 U.S.C. § 246(c)(3) so that Progressive did not meet the 16–day holding period prescribed in 26 U.S.C. § 246(c)(1)(A) and thus failed to qualify for the "dividends received" deduction otherwise allowed corporate taxpayers by 26 U.S.C. § 243, and (2) whether Progressive's purchase of a stock and the simultaneous, or nearly simultaneous, sale of deep-in-the-money call options resulted in a holding period of zero under 26 U.S.C. § 246(c)(3) so that Progressive did not meet the 16–day holding period prescribed in 26 U.S.C. § 246(c)(1)(A) and thus failed to qualify for the dividends received deduction established by 26 U.S.C. § 243. For the reasons that follow, we reverse and remand.

## I.

The facts are stipulated and are not in dispute. During 1980, 1981, and 1982, Progressive was a casualty insurer with its principal place of business in Ohio. Like most insurance companies, Progressive maintained an active investment portfolio, and one of the strategies Progressive used in trading for its own portfolio is called a "forward conversion."

A forward conversion consists of three substantially contemporaneous transactions. The first is the purchase of a block of common stock ("stock" or "underlying stock"). The second is the purchase of a put option [1] on a similar quantity of the same stock as was purchased. The third consists of the selling of a call option [2] on a similar quantity of the same stock. An example offered by the parties of such a tripartite forward conversion is as follows:

> [Taxpayer] acquires 100 shares of the common stock of the Company A for $49.00 per share on Day 1. Also on Day 1, [taxpayer] purchases for $200.00 the right to put 100 shares of Company A stock to a third party at a price of $50.00 per share on or before Day 91. [Taxpayer] also sells for $300.00 a call on 100 shares of Company A common stock which entitles a third party to purchase from it the 100 shares of Company A stock at a price of $50.00 per share on or before Day 91.

Brief of Appellant at 3.[3] The purpose of such a forward conversion strategy was to hedge the stock purchase. Thus, if the price of the underlying stock stayed below the exercise price of the options as of the exercise date, Progressive would exercise its put option and sell the stock at the exercise price. If the price of the stock rose above the exercise price, the holder of the call option on the stock would almost certainly exercise his call option and require Progressive to sell the stock at the exercise price.

During 1981 and 1982, Progressive employed this forward conversion strategy and received substantial stock dividends which it included in income. During those years, 26 U.S.C. § 243 [4] provided that a

---

**1.** A put option is an option to sell a stock at a particular price on or before a specified date. Having bought a put option, the buyer has the right to sell the stock at the set price (called the "exercise" or "strike" price) at any time before the expiration of the option.

**2.** A call option is an option to buy a stock at a given price on or before a specified date. The seller of a call option is obligated to sell the designated stock at a particular price if the buyer of the option elects to exercise it on or before the specified date.

**3.** Progressive accepts, with minor exceptions, the statement of facts by the government. Brief of Appellee at 1.

**4.** All statutory references are to the Internal Revenue Code of 1954. Some of these provisions were amended in 1984, but the parties agree that the 1954 code provisions control this case.

corporate taxpayer could claim a "dividends received" deduction for 85 percent of the dividends it received from domestic corporations. Another provision of the code, 26 U.S.C. § 246(c)(1)(A), provided that the dividends received deduction would be allowed only if the stock paying the dividends had been held by the taxpayer for at least sixteen days. Moreover, 26 U.S.C. § 246(c)(3) set up certain rules for determining whether the taxpayer had held the underlying stock long enough to qualify for the deduction. In relevant part it provided:

> The holding periods determined under the preceding provisions of this paragraph shall be appropriately reduced (in the manner provided in regulations prescribed by the Secretary) for any period (during such holding periods) in which the taxpayer has the option to sell, is under a contractual obligation to sell, or has made (and not closed) a short sale of, substantially identical stock or securities.

Although Progressive held options to sell (put options) substantially identical stock to that which it owned for the entire period of its ownership of the stock, it claimed dividends received deductions for $1,026,899 in 1981 and $3,655,193 for 1982.

In a second kind of strategy distinct from its forward conversion strategy, Progressive bought stock before its ex-dividend date [5] and at the same time, or shortly thereafter, sold an in-the-money call option on the stock it had purchased.[6] Employing this second strategy during 1980, 1981, and 1982, Progressive received dividends of approximately $97,000 and claimed a dividends received deduction for each of those years.

Following an audit in 1985, the Internal Revenue Service disallowed the dividends received deductions Progressive had claimed. The deductions with respect to the forward conversion transactions were disallowed because, under section 246(c)(3), the put options held by Progressive concurrently with its ownership of the stock in question effectively reduced the holding period of the stock to less than sixteen days, *i.e.*, zero. Similarly, as to Progressive's second strategy of selling simultaneous in-the-money call options, the IRS determined that the dividends received deductions should be disallowed because the call options were so deep-in-the-money that they were the equivalent of obligations to sell the stock and that, as such, they, too, reduced the relevant holding period to zero pursuant to section 246(c)(3).

Following the disallowance of its deductions, Progressive filed a tax refund action on December 21, 1988. The district court granted Progressive's motion for summary judgment because it thought that a Treasury Regulation, 26 C.F.R. § 1.246–3(d)(2), was controlling and that it required a taxpayer to be short of the stock before the holding period stopped running. Ruling that Progressive was never in a "short position" because at all times it actually owned the stock it bought or sold options on, the district court concluded that Progressive had held its stock long enough to qualify for the dividends received deductions it had taken. This timely appeal followed.

## II.

### A.

■ Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. Because the facts in this

---

**5.** The ex-dividend date of a stock is the date on which the stock is first sold without the right to receive a previously declared dividend. Usually this is the business day following the distribution of a dividend. The purpose of buying stock shortly before its ex-dividend date is to position oneself as a holder of the stock in order to receive a dividend.

**6.** A call option is in-the-money if the exercise price of the option is below the market trading price of the stock on the day the option was issued. Thus, if a stock sold for $50 a share, a call option entitling a third party to buy that stock for $45 prior to a given date would be referred to as an in-the-money call option. A call option is deep-in-the-money if the exercise price is well below the market trading price on the date the option is issued.

case are stipulated, there is no genuine issue as to any material fact, and the sole question is whether Progressive was entitled to a judgment as a matter of law. A district court's grant of summary judgment is reviewed de novo. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1472 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988).

### B.

The district court held that Progressive was entitled to the dividends received deductions with respect to its forward conversion strategy because a regulation issued by the Secretary of the Treasury, 26 C.F.R. § 1.246–3(d)(2), should be read to require that the taxpayer actually be short the stock before the holding period is tolled. In so doing, the court focused on the following introductory sentence of the regulation:

> (2) *Special rules.* Section 246(c) requires that the holding periods determined thereunder shall be appropriately reduced for any period that the taxpayer's stock holding is *offset* by a corresponding *short position resulting from an option to sell,* a contractual obligation to sell, or a short sale of, substantially identical stock or securities.

(Emphasis added).

This regulation was expressly authorized by Congress in the text of section 246(c)(3), and the district court held that the regulation should be "deemed legislative and therefore binding on a court." J.A. 33. Because Progressive actually owned the underlying stock at all times during which it also held a put option on the stock, the district court reasoned that Progressive was never in a "short position" within the meaning of the regulation. It therefore concluded that "Progressive was justified in relying on the regulation ...," J.A. 34, and that the deductions were properly taken.

■ The governing statute, 26 U.S.C. § 246(c)(3), does not use the phrase "short position." It states flatly that the "holding periods ... shall be appropriately reduced ... for any period ... in which the taxpay-

er has an option to sell...." The statute thus requires that the period during which the stock is held must be reduced day for day by any period during which the taxpayer also has an option to sell a similar amount of the same stock. Thus, the statute fits the factual situation in this case clearly and exactly.

■ The government argues that the district court's construction of the regulation is erroneous and conflicts with the plain language of the statute, which does not use the phrase "short position," and which unambiguously states that any period during which a taxpayer holds an option to sell stock identical to that which it owns "shall" be used to reduce the holding period under section 246(c). The plain language of a statute determines the meaning of the statute, *Escondido Mutual Water Co. v. La Jolla, Rincon, San Pasqual, Pauma & Pala Bands of Mission Indians,* 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984); *Jefferson County Pharmaceutical Ass'n, Inc. v. Abbott Laboratories,* 460 U.S. 150, 157, 103 S.Ct. 1011, 1017, 74 L.Ed.2d 882 (1983), and obliges the courts to do only one thing with respect to the statute: "enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917), *quoted with approval in United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

Progressive succeeded in diverting the district court's attention from the statute to the regulation issued pursuant to the statute, viz., 26 C.F.R. § 1.246–3(d)(2), and creating confusion by arguing that the phrase used only in the regulation, "short position," results in the addition of a requirement that the taxpayer actually be short of the given stock (by not owning it) before the statutory holding period is to be reduced. Without an analysis of the statute or a finding that it was in some way ambiguous, the district court went directly to the regulation and engaged in a construction of a phrase found in the regulation, but not in the statute. It was error to rely on such an interpretation of the regu-

lation without first finding that the statute itself was ambiguous.

■ It is obvious that the statute, in its parenthetical language, does delegate to the Secretary of the Treasury the power to provide by regulation the "manner" in which the holding periods "shall be appropriately reduced...." That delegation, however, does not purport to authorize the Secretary to abrogate the express terms of the statute, which provide that the holding period shall be reduced where the taxpayer has a concurrent option to sell the same stock. Beyond its introductory sentence, the body of the regulation purports only to describe how the holding periods should be calculated when the amount of stock actually owned by a corporation differs from the amount of stock comprehended in one of the three "short positions" described in the statute, i.e., holding a put option, being obligated on a call option, or having actually sold the same stock short. The regulation in no way modifies the express terms of the statute, nor could it lawfully do so. Treasury regulations cannot be given a construction that will violate the language of the statute they implement. *C.I.R. v. Landers Corp.*, 210 F.2d 188, 191 (6th Cir. 1954); *C.I.R. v. Netcher*, 143 F.2d 484, 487 (7th Cir.), *cert. denied*, 323 U.S. 759, 65 S.Ct. 92, 89 L.Ed. 607 (1944). "The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of Fed. Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986).

Even if the district court had properly resorted to the regulation for assistance in interpreting the statute, the interpretation given the regulation by the district court is internally inconsistent. The district court held that the regulation allowed the holding period to run, despite the holding of offsetting put options, as long as the taxpayer actually owned an equivalent amount of the underlying stock. Thus, according to the district court, the holding period would be reduced only when the corporate taxpayer was actually short the stock in

question, i.e., when it did not own that stock. If the taxpayer does not own the stock, however, it will not receive any dividends to which the deduction at issue might apply. Thus, no corporation in a "short position" as defined by the district court would ever receive a dividend in the first place. This makes nonsense out of the very idea of a *holding* period.

Moreover, it appears that Congress meant the statute to apply to situations in which the corporate taxpayer was in both a "long" and "short" position with respect to the same stock. The Senate Finance Committee report stated:

> Special rules are provided in paragraph (3) of the new subsection (c) to be used in determining (for purposes of applying the rules of the subsection) the period for which the taxpayer has held any share of stock.... Paragraph (3) further provides that the holding periods (as determined above) shall be reduced for any period (during such holding periods) in which the taxpayer *is in both a "long" and "short" position.* Specifically, it is provided that the holding period shall be appropriately reduced (in a manner provided in Regulations prescribed by the Secretary or his delegate) for any period in which the taxpayer has an option to sell, is under a contractual obligation to sell, or has made (and not closed) a short sale of substantially identical stock or securities.

S.Rep. No. 1983, 85th Cong., 2d Sess. 140 (1958), *reprinted in* 1958–3 C.B. 922, 1061. It is clear from this committee report that the statute contemplates reductions of holding periods in situations in which the taxpayer is simultaneously in long and short positions respecting the same stock. This situation, in which a taxpayer is both long and short on the same stock at the same time, would be impossible under the district court's definition of "short position" because its definition excludes ownership of the stock, i.e., being long in the stock.

■ Wherever possible, courts should read regulations to be consistent with the statutes that authorize them, and a con-

struction that thwarts the statute which the regulation implements is impermissible. *Montero v. Meyer*, 861 F.2d 603, 609 (10th Cir.1988), *cert. denied*, 492 U.S. 921, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989); *Jochum v. Pico Credit Corp. of Westbank, Inc.*, 730 F.2d 1041, 1047 (5th Cir.1984); *Insurance Company of North America v. Gee*, 702 F.2d 411, 414 (2d Cir.1983). The district court's erroneous reliance on a Treasury regulation it has misinterpreted results in the nullification of the applicable statutory mandate in this case, *i.e.*, that the holding period "shall be appropriately reduced ... for any period ... in which the taxpayer has an option to sell...." 26 U.S.C. § 246(c)(3). Thus, the statute requires that the holding period in this case be reduced by the period of time during which Progressive held put options on the same stock it owned, and, because it held put options on the same stock it owned at all times during its ownership, the holding period was zero, and Progressive was not entitled to the dividends received deductions it took.

## C.

As to Progressive's second strategy, distinct from its forward conversion strategy, the district court held that Progressive's simultaneous purchase of stock and sale of in-the-money call options on that stock did not operate to reduce the required holding period to zero because, as with the forward conversion transactions, Progressive was never in a "short position" with respect to the stock, at least according to the district court's definition of "short position." Thus, the district court relied on its interpretation of the regulation, 26 C.F.R. § 1.246–3(d)(2), in the same manner as it had regarding the forward conversion transactions involving put options. As has been previously demonstrated, this was erroneous because the district court ignored the plain meaning of the statute and the rule of construction which requires regulations to be read as consistent with the statutes they implement where such a construction is possible.

With respect to the transactions involving Progressive's forward conversion strategy, the government filed a cross-motion for summary judgment. However, as to the second strategy involving the simultaneous purchase of stock and sale of in-the-money call options, the government did not file a cross-motion for summary judgment, and instead asked the district court to decide whether the in-the-money call options sold by Progressive in connection with its second strategy were so deep-in-the-money, *i.e.*, so far below the market trading price on the day they were sold, that each was the equivalent of "a contractual obligation to sell" within the meaning of the statute. It argued that the very low exercise price made it virtually certain that the purchasers of the call options would exercise them, thus obligating Progressive to sell the stock. Because of its resolution of this case, the district court never addressed the question of whether the in-the-money call options sold by Progressive were so deep-in-the-money that they should be treated as contractual obligations to sell the stock for purposes of calculating holding periods under section 246(c).

There is authority to support the government's argument in this regard. Rev.Rul. 80–238, 1980–2 C.B. 96, issued in 1980 and applicable to the years here in question, explains that the selling of a call option at-the-money (where the exercise price is the current market price) or out-of-the-money (where the exercise price is above the current market price) does not reduce the taxpayer's holding period for the underlying stock under section 246(c). It goes on to explain, however, that the situation is different where in-the-money call options are involved.

> Such considerations, however, are not applicable to "in-the-money" call options, that is, call options that are sold with a striking price below the market price of the underlying stock on the date that the option is written, since in such a situation the exercise of such options may be virtually guaranteed and the element of risk is either greatly reduced or eliminated.

1980–2 C.B. at 96. This court has held that revenue rulings "are entitled to great deference, and have been said to 'have the force of legal precedents unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.'" *Amato v. Western Union Intern., Inc.*, 773 F.2d 1402, 1411 (2d Cir.1985) (quoting *Fred H. McGrath & Son, Inc. v. United States*, 549 F.Supp. 491, 493 (S.D.N.Y.1982)).

The district court pretermitted the resolution of this issue when it decided the case based on its erroneous interpretation of 26 C.F.R. § 1.246–3(d)(2). Therefore, this matter should be remanded to the district court for a determination of whether the call options sold by Progressive were so deep-in-the-money as to be the equivalents of the contractual obligations to sell mentioned in section 246(c)(3).

### D.

The parties argue over whether Congress intended to require a corporate stockholder to expose itself to an actual risk of loss before becoming entitled to the dividends received deduction. The government contends that certain 1984 amendments to the statute, which do not apply directly to the years in question here, show that Congress considered risk of loss a prerequisite to the deduction. Progressive argues that the legislative history of the 1984 amendments is irrelevant to an earlier Congress' intent.

The answers in this case are clear enough from the statute, however, and "[w]here the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). Moreover, courts place little reliance on "inconclusive legislative history ... to define a statutory term enacted by a prior Congress." *United States v. American College of Physicians*, 475 U.S. 834, 846–47, 106 S.Ct. 1591, 1598, 89 L.Ed.2d 841 (1986). *See also United States v. Southwestern Cable Co.*, 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968) ("[V]iews of one Congress as to the construction of a statute adopted many years before by another Congress have 'very little, if any, significance.'"); *Rainwater v. United States*, 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996 (1958) (same).

### III.

For the reasons stated, the district court's holding allowing Progressive to take the dividends received deductions with respect to its forward conversion transactions is REVERSED, and the district court is directed to enter summary judgment for the United States of America on this issue. As regards the district court's holding that Progressive was also entitled to its dividends received deductions as to its second investment strategy involving the sale of in-the-money call options, that holding is likewise REVERSED, and the matter is REMANDED to the district court for a determination of whether Progressive's in-the-money call options were contractual obligations to sell within the meaning of 26 U.S.C. § 246(c)(3).